<u>NOT FOR PUBLICATION</u>

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| PHYLLIS SIEGEL, | Civil Action No. 15-cv-3428 (SDW) |
| Plaintiff, | |
| v. | **OPINION** |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | April 29, 2016 |

**WIGENTON**, District Judge.

This matter comes before this Court on Plaintiff Phyllis Siegel's ("Plaintiff") appeal of the final administrative decision of the Commissioner of Social Security (the "Commissioner"), with respect to Administrative Law Judge Donna A. Krappa's ("ALJ Krappa") March 4, 2015 denial of Plaintiff's claim for Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act"). This appeal is decided without oral argument pursuant to Federal Rule of Civil Procedure 78. This Court has subject-matter jurisdiction pursuant to 42 U.S.C. § 405(g). Venue is proper under 28 U.S.C. § 1391(b). For the reasons set forth below, the Commissioner's decision is **REVERSED** and this matter is **REMANDED** for further proceedings.

I.  BACKGROUND

A.  PROCEDURAL HISTORY

Plaintiff filed her claim for DIB on July 3, 2007. (Tr. 296.) That application was denied both initially and upon reconsideration. (Tr. 300-04, 309-11.) Plaintiff's subsequent request for a hearing before an administrative law judge was granted, (Tr. 465-68), and ALJ Krappa held a

1

hearing on August 12, 2010. (Tr. 516). On November 22, 2010, ALJ Krappa issued a decision finding Plaintiff not disabled and denying her claim for DIB. (Tr. 287-95.) On April 1, 2011, the Appeals Council denied Plaintiff's request for review of ALJ Krappa's 2010 Opinion, making it the Commissioner's final decision. (Tr. 275-277.) Plaintiff then appealed to the U.S. District Court for the District of New Jersey and on January 13, 2014, the court issued a consent order reversing the Commissioner's decision and remanding Plaintiff's claim for further proceedings. *See Siegel v. Comm. Soc. Sec.*, No. 2:13-cv-1970-SDW; (Tr. 897A.)

On October 8, 2014, ALJ Krappa held another hearing on Plaintiff's DIB claim. (Tr. 562.) ALJ Krappa subsequently denied Plaintiff's DIB claim for the second time on March 4, 2015. (Tr. 543-559.) Plaintiff then filed an appeal of the Commissioner's final decision with this Court on May 19, 2015. (Dkt. No. 1.)

**B. Factual History**

Plaintiff's DIB claim alleges disability beginning May 20, 1984, and a date last insured ("DLI") of December 31, 1989. (Tr. 296-99.) Plaintiff's claim is based on post-traumatic stress disorder ("PTSD"), herniated discs, depression, scoliosis, and osteoporosis. (*See* Tr. 300.) Records in the administrative record date back to 1984. However, there is a gap in the records from 1987 to 1998.[1]

*1. Medical Records: 1984 to 1987*

Medical records from the John F. Kennedy ("JFK") Medical Center indicate that Plaintiff was admitted on December 11, 1984, for hypokalemia with gastroenteritis. (Tr. 368.) According to those records, Plaintiff had attempted suicide three weeks earlier. (*Id*.) In addition, Plaintiff

---

[1] According to Plaintiff, the retirement and subsequent death of the surgeon who treated her in 1987 and "for years thereafter," as well as a gas explosion that destroyed her home and its contents on March 23, 1994, explain the gap in her medical records. (*See* Br. Supp. Pl. Siegel ("Pl.'s Br. Supp.") 19. n.2.)

2

claimed she suffered from self-induced vomiting over the previous three years and had lost 190 pounds, nearly two thirds of her bodyweight. (*Id*.)

Plaintiff returned to the hospital on October 28, 1985, due to a herniated lumbar disk, and was not discharged until November 8, 1985. (Tr. 378.) The discharge summary notes Plaintiff's "chronic back pain radiating down [her] right leg," that she was "unresponsive to outpatient oral medication and physical therapy," and that she suffered from depression. (*Id*.) In addition, the notes indicate that "a CT scan of the spine . . . revealed bulging discs at L3/4 and L4/5 with narrowing of the spinal canal at the level of L4/5." (*Id*.) Plaintiff was treated using traction, transcutaneous electrical nerve stimulation, Robaxin (a muscle relaxant), and oral anti-inflammatories. (*Id*.) Moreover, notes from November 1, 1985, indicate "[Plaintiff] had to be admitted to the hospital because the conservative management on an outpatient basis [for her back pain] failed to give her relief." (Tr. 381.) Yet, all of this treatment "seemed to have helped her some, but not considerably." (*Id*.)

Additional records from JFK Medical Center indicate Plaintiff was diagnosed with a herniated disc, arthritis, and depression on September 10, 1987, when she was again placed in traction and treated with analgesics. (Tr. 403.) The notes also indicate the need for surgery because Plaintiff "did not respond well to therapy." (*Id*.)

On October 5, 1987, Plaintiff was again admitted to JFK Medical Center, this time because of "intractable radicular pain." (Tr. 390.) According to the discharge summary, "[Plaintiff] underwent a lumbar myelogram which showed an L5-S1 HNP with root sleeve asymmetry and an [sic] L4-L5 and L3-L4 bulges." (*Id*.) On October 6, 1987, Plaintiff underwent an operation: a "right sided L5-S1 inter lamina micro surgical exploration and micro discectomy." (Tr. 393.) The postoperative diagnosis was "intractable right sided sciatalgia secondary to entrapped S1 nerve

root secondary to L5-S1 herniated nucleus pulposus." (*Id*.) Plaintiff was discharged on October 9, 1987. (Tr. 390.)

### 2. *Medical Records: 1998 and Later*

The earliest medical record in the administrative record regarding the period after Plaintiff's October 9, 1987 JFK Medical Center discharge appears to be an operation report from Thomas Jefferson University dated September 9, 1998. (*See* Tr. 1022.) In that record, Dr. Gregory Przybylski, M.D. ("Dr. Przybylski"), indicated that Plaintiff "developed pain in her back and legs which progressed over time and underwent a lumbar laminectomy and unilateral left sided arthrodesis from L-3 to the sacrum on 10-10-96." (*Id.*) The notes also indicate that Plaintiff's preoperative diagnosis was "lumbosacral pseudoarthrosis . . . [,] lumbar scoliosis . . . [,] and lumbar instability." (*Id.*) Accordingly, Dr. Przybylski performed a posterior lateral arthrodesis at L3-4, L4-5, and L5-S1. (Tr. 1022-24.) In addition, Dr. Przybylski inserted "posterior segmental instrumentation with synthes variable angle pedicle fixation" and performed a "harvest of right iliac crest cancellous autograft via separate facial incision." (*Id.*) However, Plaintiff had to undergo another operation on September 22, 1998, to drain a lumbar wound seroma, (Tr. 1018-19), and another on March 17, 1999, to remove the instrumentation because Plaintiff had "recurrent fevers of unknown origin . . . ." (Tr. 1020-21.)

On June 27, 2000, Dr. Sofia Lam, M.D. ("Dr. Lam"), performed a surgery for Plaintiff's "severe postlaminectomy syndrome with residual radicular symptomatology bilaterally with the main focus in L5 and S1 nerve root distribution." (Tr. 1025.) The notes from the Brunswick Surgical Center indicate that Dr. Lam performed a "1st stage caudal neurolysis targeting L5 nerve root sleeve, lumbar myelogram without dural puncture, interpretation of myelogram, fluoroscopy, and prolonged observation." (*Id*.) Dr. Lam performed the second stage of that surgery on July 25,

4

2000, (Tr. 1028-29), and a third stage on August 15, 2000.  (Tr. 1031-33.)  Additional records from Brunswick Surgical Center indicate that Plaintiff underwent several more procedures with Dr. Lam between September 19, 2000 and January 2, 2001, including lumbar facet joint injections and cervical neuroplasty procedures.  (*See* Tr. 1034-43.)

Notes from Riverview Medical Center indicate that Plaintiff underwent a surgery with Dr. Bruce Rosenblum, M.D. ("Dr. Rosenblum"), on June 22, 2001.  (Tr. 1044-45.)  Dr. Rosenblum's notes indicate that he performed an "L2-L3 microlumbar diskectomy [sic]" and an "interoperative interpretation of lateral lumbrosacral spine x-ray."  Plaintiff also had a "lumbar epidural steroid injection and caudal epidural steroid injection" on July 17, 2002.  (Tr. 1048-49.)  By that point, Plaintiff was diagnosed with "failed back syndrome."  (Tr. 1048.)  Dr. Scott Metzger, M.D., confirmed that diagnosis on October 9, 2002, when Plaintiff was given additional injections.  (Tr. 1053.)  Records indicate a number of additional procedures performed at Riverview Medical Center throughout 2001 and 2002.  (Tr. 1053-65.)

Following her procedures at Riverview Medical Center, Plaintiff continued to undergo operations for her back disorder.  For example, on February 25, 2004, Plaintiff underwent the first stage of a three-stage procedure (exploration of fusion, pars osteotomy at L2 and laminectomy at L2-3) at New York University Medical Center.  (Tr. 1069.)  In total, it appears that Plaintiff has undergone at least ten surgeries on her spine.

In addition to the treatment records, the administrative record contains submissions from three doctors addressing whether Plaintiff's impairments after 1996 began before, and continued since, her December 31, 1989 DLI.  First, in a report dated September 22, 2009, Dr. Mark J. Ruoff, M.D. ("Dr. Ruoff"), diagnosed Plaintiff with "neuropathic pain . . . [,] post-laminectomy syndrome . . . [,] and lumbar kyphoscoliosis" and noted that Plaintiff's severe back pain, which was related

5

to the birth of her child in 1984, had "never subsided." (Tr. 422-23.) Dr. Ruoff also noted that Plaintiff's condition is a "permanent condition." (Tr. 423.)

The administrative record also contains a retrospective report from Dr. Raymond S. Dimetrosky, D.Ed. ("Dr. Dimetrosky"), a licensed psychologist. (Tr. 424-27.) Dr. Dimetrosky's report indicates that he saw Plaintiff on September 15, 2009 and September 23, 2009. (*Id.*) According to Dr. Dimetrosky's report, Plaintiff "has been chronically depressed since 1984 when the excessive back pain first occurred." (*Id.*)

Finally, Plaintiff submitted a retrospective report from Dr. Kenneth R. Kaufman, M.D., MRCPsych ("Dr. Kaufman"), dated October 4, 2011. (Tr. 631-35.) According to Dr. Kaufman, Plaintiff suffers from recurrent major depression, PTSD, "anxiety NOS . . . [, and] chronic pain syndrome with psychological and other organic components." (Tr. 634.) Specifically, Dr. Kaufman noted that Plaintiff's depression "dat[ed] back to her teenage years." (Tr. 631.)

### 3. *Hearing Testimony*

Although Plaintiff's DLI was not until December 31, 1989, it appears that there are not medical records in the administrative record pertaining to the time between Plaintiff's October 9, 1987 discharge from JFK Medical Center and December 31, 1989. Accordingly, there are no medical records covering over two years of the relevant period in which Plaintiff must have been disabled in order to be eligible for DBI. Nor are there medical records in the administrative record regarding the period between Plaintiff's DLI and 1998. In addition to explaining this gap in her brief, (*See* Pl.'s Br. Supp. 19 n.2), Plaintiff also provided testimony at both hearings before ALJ Krappa regarding the history of her ailments. (*See* Tr. 515-542, 650-594.)

In the August 12, 2010 hearing, Plaintiff explained that she began to suffer from PTSD in the relevant period after her mother was diagnosed with, and subsequently died from, ovarian

6

cancer.  (Tr. 518.)  This was compounded by the facts that Plaintiff was pregnant with her first child at the time and that her husband left her six months after her child was born. (*Id*.)  Plaintiff also indicated that her back pain began on May 20, 1984, the day on which her first child was born.  (Tr. 521.)  In addition, although Plaintiff stated that she thought the next surgery after her 1987 operation was in 1997, she also indicated that between her second child's birth on August 31, 1988, and her DLI, she was "seeing chiropractors . . . [,] pain doctors . . . [,] orthopedists and neurosurgeons."  (Tr. 531.)

## II.   LEGAL STANDARD

### A.  Standard of Review

In Social Security appeals, this Court has plenary review of the legal issues decided by the Commissioner.  *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  Yet, this Court's review of the ALJ's factual findings is limited to determining whether there is substantial evidence to support those conclusions.  *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).

Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (internal citation and quotations omitted).  Thus, substantial evidence is "less than a preponderance of the evidence, but 'more than a mere scintilla.'"  *Bailey v. Comm'r of Soc. Sec.*, 354 F. App'x. 613, 616 (3d Cir. 2009) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  Importantly, "[t]his standard is not met if the Commissioner 'ignores, or fails to resolve, a conflict created by countervailing evidence.'"  *Bailey*, 354 F. App'x. at 616 (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)).  However, if the factual record is adequately developed, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being

supported by substantial evidence." *Daniels v. Astrue*, No. 4:08-cv-1676, 2009 WL 1011587, at *2 (M.D. Pa. Apr. 15, 2009) (quoting *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966) (internal quotation marks omitted)). "The ALJ's decision may not be set aside merely because [a reviewing court] would have reached a different decision." *Cruz v. Comm'r of Soc. Sec.*, 244 F. App'x. 475, 479 (3d Cir. 2007) (citing *Hartranft*, 181 F.3d at 360). This Court is required to give substantial weight and deference to the ALJ's findings. *See Scott v. Astrue*, 297 F. App'x. 126, 128 (3d Cir. 2008). Nonetheless, "where there is conflicting evidence, the ALJ must explain which evidence he accepts and which he rejects, and the reasons for that determination." *Cruz*, 244 F. App'x. at 479 (citing *Hargenrader v. Califano*, 575 F.2d 434, 437 (3d Cir. 1978)).

In considering an appeal from a denial of benefits, remand is appropriate "where relevant, probative and available evidence was not explicitly weighed in arriving at a decision on the plaintiff's claim for disability benefits." *Dobrowolsky v. Califano*, 606 F.2d 403, 407 (3d Cir. 1979) (quoting *Saldana v. Weinberger*, 421 F. Supp. 1127, 1131 (E.D. Pa. 1976) (internal quotation marks omitted). Indeed, a decision to "award benefits should be made only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits." *Podedworny v. Harris*, 745 F.2d 210, 221–22 (3d Cir. 1984) (citations omitted).

### B. The Five-Step Disability Test

A claimant's eligibility for social security benefits is governed by 42 U.S.C. § 1382. An individual will be considered disabled under the Act if the claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment" lasting continuously for at least twelve months. 42 U.S.C. § 423(d)(1)(A). The impairment must be severe enough to render the individual "not only unable to do his previous

8

work but [unable], considering his age, education, and work experience, [to] engage in any kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). A claimant must show that the "medical signs and findings" related to his or her ailment have been "established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged . . . ." 42 U.S.C. § 423(d)(5)(A).

To make a disability determination, the ALJ follows a five-step sequential analysis. 20 C.F.R. §§ 404.1520(a), 416.920(a); *see also Cruz*, 244 F. App'x at 480. If the ALJ determines at any step that the claimant is or is not disabled, the ALJ does not proceed to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

Step one requires the ALJ to determine whether the claimant is engaging in substantial gainful activity ("SGA"). 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). SGA is defined as work that "[i]nvolves doing significant and productive physical or mental duties . . . for pay or profit." 20 C.F.R. §§ 404.1510, 416.910. If the claimant engages in SGA, the claimant is not disabled for purposes of receiving social security benefits regardless of the severity of the claimant's impairments. *See* 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the individual is not engaging in SGA, the ALJ proceeds to step two.

Under step two, the ALJ determines whether the claimant suffers from a severe impairment or combination of impairments that meets the duration requirement found in Sections 404.1509 and 416.909. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). An impairment or a combination of impairments is not severe when medical and other evidence establishes only a slight abnormality or combination of abnormalities that would have a minimal effect on an individual's ability to

work.  20 C.F.R. §§ 404.1521, 416.921; Social Security Rule ("SSR") 85-28, 96-3p, 96-4p.  An impairment or a combination of impairments is severe when it significantly limits the claimant's "physical or mental ability to do basic work activities."  20 C.F.R. §§ 404.1520(c), 416.920(c).  If a severe impairment or combination of impairments is not found, the claimant is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  If the ALJ finds a severe impairment or combination of impairments, the ALJ then proceeds to step three.

Under step three, the ALJ determines whether the claimant's impairment or combination of impairments is equal to, or exceeds, one of those included in the Listing of Impairments in 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  If an impairment or combination of impairments meets the statutory criteria of a listed impairment as well as the duration requirement, the claimant is disabled and entitled to benefits.  20 C.F.R. §§ 404.1520(d), 416.920(d).  If, however, the claimant's impairment or combination of impairments does not meet the severity of the listed impairment, or if the duration is insufficient, the ALJ proceeds to the next step.

Before undergoing the analysis in step four, the ALJ must determine the claimant's residual functional capacity ("RFC").  20 C.F.R. §§ 404.1520(a), 404.1520(e), 416.920(a), 416.920(e).  An individual's RFC is the individual's ability to do physical and mental work activities on a sustained basis despite limitations from his or her impairments.  20 C.F.R. §§ 404.1545, 416.945.  The ALJ considers all impairments in this analysis, not just those deemed to be severe.  20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2); SSR 96-8p.  After determining a claimant's RFC, step four then requires the ALJ to determine whether the claimant has the RFC to perform the requirements of his or her past relevant work.  20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f).  If the claimant is able to perform his or her past relevant work, he or she will not be found disabled under the Act. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f), 416.920(a)(4)(iv), 416.920(f).  If the claimant is unable

to resume his or her past work, the disability evaluation proceeds to the fifth and final step.

At step five, the ALJ must determine whether the claimant is able to do any other work, considering his or her RFC, age, education, and work experience. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). Unlike in the first four steps of the analysis where the claimant bears the burden of persuasion, the burden shifts to the ALJ at step five to determine whether the claimant is capable of performing an alternative SGA present in the national economy. 20 C.F.R. §§ 404.1520(g)(1) (citing 404.1560(c)), 416.920(g)(1) (citing 416.960(c)); *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987). At this point in the analysis, the Social Security Administration ("SSA") is "responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that [the claimant] can do, given [the claimant's RFC] and vocational factors." 20 C.F.R. §§ 404.1560(c)(2), 416.960(c)(2). If the claimant is unable to do any other SGA, he or she is disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

## III. DISCUSSION

In her March 4, 2015 Opinion, ALJ Krappa applied the Five-Step Disability Test to the facts comprising Plaintiff's application for DIB and determined that Plaintiff was not disabled under the relevant portions of the Act between the dates of May 20, 1984 and December 31, 1989. (*See* Tr. 546-59.) Specifically, ALJ Krappa determined that during the relevant period, Plaintiff "was capable of the *exertional demands* of light work. . . [,]" (Tr. 552), and "was capable of making a successful adjustment to other work that existed in significant numbers in the national economy." (Tr. 559.) ALJ Krappa determined that, through her DLI, Plaintiff "would have been able to perform the requirements of the following occupations: office helper, photocopy operator, and garment sorter." (Tr. 558-59.) Therefore, ALJ Krappa reasoned, Plaintiff was "not under a

disability as defined by the Social Security Act" through her DLI under 20 C.F.R. § 404.1520(g). (Tr. 559.)

In reaching her conclusion regarding Plaintiff's status between the period of Plaintiff's claimed onset (May 20, 1984) and DLI (December 31, 1989), ALJ Krappa noted that the evidence in the record pertaining to that period "is sparse." (Tr. 553.) Although Plaintiff did submit three retrospective reports from doctors which attempted to determine whether Plaintiff's ailments began before, and were continuous since, her DLI, (Tr. 422-27, 631-35), ALJ Krappa "gave little weight" to those reports because the doctors examined Plaintiff "long after the period under consideration—May 20, 1984 to December 31, 1989." (Tr. 555-556.) Yet, despite the lack of medical records pertaining to the relevant period and ALJ Krappa's rejection of later retrospective medical reports, ALJ Krappa denied Plaintiff's October 8, 2014 request for expert testimony from psychiatric and orthopedic experts. (Tr. 547.) Although Plaintiff requested this expert testimony in order to aid ALJ Krappa in determining whether Plaintiff was disabled during the relevant period, ALJ Krappa found that such expert testimony "would [not] be of assistance . . . and would be a waste of resources." (*Id*.) However, this determination was contrary to applicable law.

It is Plaintiff's position that the physical and mental impairments noted in the medical records after 1998 began in the period before her DLI and have continued since then. (*See* Pl.'s Br. Supp. 18.) In light of this claim, Plaintiff argues that ALJ Krappa was required, under SSR 83-20, to seek expert medical testimony to aid her in determining the onset date of Plaintiff's claimed disabilities. (*Id*. at 21.)

SSR 83-20 "provides ALJs with an analytical framework for determining a disability onset date." *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 548 (3d Cir. 2003). In particular, SSR 83-20 notes that there are instances in which an ALJ may be required to infer the onset date of a

claimant's disability because precise medical evidence of the onset date is not available. *See* SSR 83-20. Therefore, SSR 83-20 states that "[an] administrative law judge should call on the services of a medical advisor," in such circumstances. However, in *Newell v. Commissioner of Social Security*, the Third Circuit held that "the ALJ *must* call upon the services of a medical advisor in a situation where the alleged impairment was a slowly progressing one, the alleged onset date was far in the past, and adequate medical records for the most relevant period were not available." 347 F.3d at 549 n.7. (emphasis added) (first citing *DeLorme v. Sullivan,* 924 F.2d 841, 848 (9th Cir. 1991); then citing *Spellman v. Shalala,* 1 F.3d 357, 363 (5th Cir. 1993); and then citing *Bailey v. Chater,* 68 F.3d 75, 79 (4th Cir. 1995).

In this instance, Plaintiff claims she suffers from several slowly progressing impairments, the alleged onset date of her claimed disabilities was over two decades in the past, and there are no medical records pertaining to the period between October 9, 1987, and Plaintiff's DLI of December 31, 1989. Yet, despite the lack of medical records from a critical time period (and ALJ Krappa's finding that neither Plaintiff's testimony nor retrospective medical reports regarding that time period were credible), ALJ Krappa denied Plaintiff's request for expert testimony to aid the ALJ in inferring the onset date of Plaintiff's claimed disabilities. (Tr. 547.) However, denying Plaintiff's request for expert medical testimony to aid ALJ Krappa in determining the onset date of disability under these circumstances violated SSR 83-20. *See Newell*, 347 F.3d at 549 (holding that "[an] ALJ should have consulted a medical advisor to help him infer the onset date as required by SSR 83–20"). In light of this error, this Court reverses the decision of the Commissioner denying Plaintiff's DIB claim and remands this matter for further proceedings, including the designation of experts to aid in the determination of the relevant onset date.

## IV. CONCLUSION

For the reasons stated above, the Commissioner's decision is **REVERSED** and this matter is **REMANDED** for further proceedings.

s/ *Susan D. Wigenton*<br>
**SUSAN D. WIGENTON**<br>
**UNITED STATES DISTRICT JUDGE**

Orig:   Clerk
cc:     Parties